**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FLOWERHORN, INC., d/b/a "HOT N JUICY CRAWFISH" and HNJ GROUP, INC. d/b/a "HOT N JUICY CRAWFISH," foreign corporations, | **No. -cv-** |
| Plaintiffs, | **JURY DEMAND** |
| v. | |
| HOT N JUICY CRAB TINLEY PARK, INC., a domestic corporation, and HOT N JUICY CRAB INCORPORATED, a domestic corporation, | |
| Defendants. | |

### VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiffs Flowerhorn, Inc. d/b/a HOT N JUICY CRAWFISH ("Flowerhorn") and HNJ Group, Inc. ("HNJ Group") d/b/a HOT N JUICY CRAWFISH, (collectively, "Plaintiffs"), by their undersigned counsel and as its Verified Complaint for Injunctive and Other Relief against Defendants HOT N JUICY CRAB TINLEY PARK, INC. and HOT N JUICY CRAB INCORPORATED (collectively, "Defendants"), allege:

### Nature of the Case

1. In this action, Plaintiffs primarily seek injunctive relief against Defendants for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), *et seq*., and deceptive business practices and consumer fraud under Illinois law because of Defendants' unlawful infringement of Plaintiffs' common law and federally-registered service marks in connection with Cajun seafood restaurants, namely its intentional use of deceptively confusing service marks in connection with Cajun seafood restaurant services of lesser quality.

1

**Parties**

2.      Flowerhorn is a Nevada corporation, with its principal place of business in Clark County, Nevada, and is the owner of certain service marks, referenced below, used in connection with its Cajun seafood restaurant services (the "Services").

3.      HNJ Group is a Texas corporation with its principal place of business in Grand Prairie, Texas, and is now the owner of certain service marks, referenced below, used in connection with the same Services.

4.      Flowerhorn and HNJ Group are affiliates and share common shareholders. Flowerhorn and HNJ are in the process of assigning ownership of all of the Marks referenced below, originally used by Flowerhorn and its Affiliates (as hereinafter defined) in commerce, to HNJ Group, a holding company established for that primary purpose.

5.      Defendants are Illinois corporations with their principal places of business in Tinley Park, Illinois and, on information and belief, Evergreen Park, Illinois, respectively.

6.      On information and belief, Defendants share common ownership and are affiliated, as they share the same agent, have similar names and addresses.

**Jurisdiction and Venue**

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (Federal Question) and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367, as those claims form part of the same case and controversy. The Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (Diversity).

8.      This Court has personal jurisdiction over Defendants as they are doing business in this District and a substantial part of the acts of which Plaintiffs complain occurred in this District.

9.     Venue is proper in the District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), as

Defendants reside here and a substantial part of the events giving rise to the claim occurred here.

## FACTS COMMON TO ALL COUNTS

Flowerhorn and Its Affiliates' Use of the Marks

10.     Flowerhorn's owner founded, owned and managed (along with others) a series of

casual Cajun seafood restaurants under the d/b/a "HOT N JUICY CRAWFISH" beginning in

2007, and has since utilized six service marks (collectively, the "Marks") in commerce to

indicate the source of the Services. The Marks are the word marks "HOT N JUICY

CRAWFISH,"™ "HOT N JUICY,"™ "HNJ"®, "QUICKIE LUNCH DEAL"™ and "TWO

HANDED PO' BOY,"™ and this logo:



11.     Currently, Flowerhorn owns the word marks "HOT N JUICY CRAWFISH,"™

"HOT N JUICY,"™ "HNJ"® as well as the logo.  Flowerhorn, however, recently assigned the

"QUICKIE LUNCH DEAL"™ and "TWO HANDED PO' BOY"™ word marks to HNJ Group,

and will soon do so with respect to the remaining four marks.

12.     Flowerhorn opened its first restaurant using the "HOT N JUICY CRAWFISH"™

service mark in Las Vegas in 2007.  Since that time, Flowerhorn's owner, along with others,

have opened and operated 13 additional (but legally separate) Cajun seafood restaurants d/b/a HOT N JUICY CRAWFISH (collectively, the "Affiliates"). In doing so, Flowerhorn licensed each of the Marks to the other 13 Affiliates.

13. Thus, there are now 14 "HOT N JUICY CRAWFISH"™ restaurants (which customers and the media also refer to simply as "HOT N JUICY"™ or "HNJ"™)[1] throughout the United States: four total in the Las Vegas, Nevada, area; two in Southern California; two in New York; three in Arizona; one in Falls Church, Virginia; one in Washington D.C.; and one in Orlando, Florida.

14. Each of the 14 restaurants operating under the Marks employ the same or similar menus, signage, décor, glassware, employee clothing, and layout.

15. For example, each of the restaurants feature Cajun seafood "boils" with crab, lobster, shrimp, clams and/or crawfish by the pound and choice of seasoning. The boils typically include Andouille sausages, corn and/or potatoes and are served in see-through plastic bags. The choices of seasoning are: (a) Louisiana; (b) Juicy Cajun; (c) Garlic Butter; (d) Lemon Pepper; and (e) "Hot N Juicy." Each of these come in a different spice level, ranging from Mild through Extra Spicy. (A true and correct copy of one of Plaintiff and its Affiliates' menus is attached hereto as Exhibit 1 at pp 2-3).

16. Each of the restaurants operating under and utilizing the Marks also offer, among other things: appetizers, such as raw oysters, fried shrimp, chicken wings, calamari, mozzarella sticks, fritters, sweet potato fries, Cajun fries and etouffee; baskets of fried shrimp, catfish, soft shell crab and chicken; and "TWO HANDED PO' BOYS"™ with catfish, crawfish, shrimp, chicken and soft shell crab. *Id.*

---

[1] For ease of reference, however, Plaintiffs will refer to their and their Affiliates' restaurants collectively herein as "HOT N JUICY CRAWFISH"™ restaurants.

17.     Each of the 14 "HOT N JUICY CRAWFISH"™ restaurants also offers a Monday through Friday, 12-4 p.m. "QUICKIE LUNCH DEAL"™ of any "Po'boy" with aside of Cajun Fries and a soda. The cost of the lunch deal is $12.00.  (A true and correct copy thereof is attached hereto as <u>Exhibit 2</u>). [2]

18.     As set forth above, Flowerhorn and its Affiliates have been using the "HOT N JUICY CRAWFISH"™ in commerce to designate the source of their Services since 2007.

19.     Flowerhorn and its Affiliates have also been using the word mark "HOT N JUICY"™ alone in commerce to designate the source of their Services since 2007.

20.     Flowerhorn and its Affiliates have been using the federally registered word mark "HNJ"® in commerce, both alone and in conjunction with the aforesaid marks, to designate the source of their Services since April of 2011. (A true and correct copy of the USPTO registration for this mark is attached hereto as <u>Exhibit 3</u>).

21.     Flowerhorn and its Affiliates have been using the logo depicted above in paragraph 10 in commerce to designate the source of their Services since April of 2011.

22.      Flowerhorn and its Affiliates have also been using the word mark "QUICKIE LUNCH DEAL"™ in commerce to designate the source of their Services since June 1, 2013. Although Flowerhorn transferred "QUICKIE LUNCH DEAL"™ to HNJ Group in July of 2018, it has continued to be used by Flowerhorn and its Affiliates under a license since that time. [3]

23.     Flowerhorn and its Affiliates have also been using the word mark "TWO HANDED PO' BOY"™ in commerce to designate the source of their Services since November

---

[2] Notably, the "HOT N JUICY CRAWFISH"™ menu, like the dba and service mark itself, utilizes mild sexual innuendo in its categories, e.g. "experiences," "temptations by the pound," "for play" (to refer to appetizers), "sweet ending" (to refer to desserts), "teasers" (to refer to sides).  The "QUICKIE LUNCH DEAL"™ and "TWO HANDED PO' BOYS" are meant to fit in with that overall theme.

[3] HNJ Group has a pending application with the USPTO to register this mark, Serial No. 88328552

1, 2011. Although Flowerhorn transferred "TWO HANDED PO' BOY"™ to HNJ Group in July of 2018, it has continued to be used by Flowerhorn and its Affiliates under a license since that time. [4]

Flowerhorn and Its Affiliates' Advertising and Promotion of the Marks

24. As discussed in more detail below, the 14 restaurants operating under the "HOT N JUICY CRAWFISH" d/b/a and service mark extensively utilize the Marks as single source indicators of their Services, including but not limited to: on exterior and interior store signage; on menus; on employee clothing; on calendars; on glassware; on bibs; in social media; on the website https://www.hotnjuicycrawfish.com (the "Website"); in email communications (e.g. info@hotnjuicycrawfish.com); and in print, electronic and television advertising (e.g. email blasts, print ads, flyers and LED screens). (True and accurate examples of such use are depicted in Group Exhibit 4, as well as Exs. 1 and 3).

25. In addition to the millions of in-restaurant customers seeing the Marks over the course of the last 12 years,[5] the Marks outside of "HOT N JUICY CRAWFISH"™ restaurants (exterior signage, menus, etc.) have been visible to countless additional millions.

26. For example, Flowerhorn's original base is Las Vegas, Nevada, where it has four "HOT N JUICY CRAWFISH"™ restaurants. One of these restaurants is located in the Planet Hollywood/Miracle Mile complex, a tourist destination in its own right. Moreover, this location

---

[4] HNJ Group also has a pending application with the USPTO to register this mark, Serial No. 88328600.

[5] Although the number may fluctuate depending on the year and month, the "HOT N JUICY CRAWFISH"™ restaurants currently have more than 600,000 customers visit their restaurants every four or so months.

employs extremely large exterior LED displays that can be seen by thousands of drivers passing by.[6]

27.     Similarly, Flowerhorn and its Affiliates have selected many of their other locations because of their proximity to famous tourist destinations, including :

- State Farm Stadium (formerly the University of Phoenix Stadium) in Glendale, Arizona, which is not only the home of the NFL's Phoenix Cardinals, but has also hosted The Fiesta Bowl, The College Football Playoff, two Super Bowls and a NFL Pro Bowl.

- The Sunset Strip on Santa Monica Blvd. in Hollywood, CA;

- The National Zoo in Washington D.C.; and

- Sea World and Walt Disney World in Orlando, Florida.

These locations give "HOT N JUICY CRAWFISH"™ restaurants and the Marks unique visibility to millions of visitors around the United States and the world.

28.     Although only one of the Marks has been federally registered to date (with two more applications pending), Flowerhorn and its Affiliates have made extensive additional efforts to: associate the Marks with their Services alone in the minds of consumers; build consumer's recognition of the Marks; and build the Marks' goodwill among consumers.  These efforts, include but are not limited to spending more than $1.38M in television, print, electronic, Internet, social media and other advertising and promotion of the Marks as identifiers of Flowerhorn and its Affiliates' Services over the last 12 years.

---

[6] By any measure or source, Las Vegas is one of the Top 10 U.S. destinations for international and domestic travelers.  See, e.g., https://www.worldatlas.com/articles/the-most-visited-cities-in-the-us.html (finding that Vegas was the 7th most visited city in the U.S.), https://360chicago.com/top-us-cities-international-domestic-visitors/ (finding that Las Vegas is the 2nd most visited U.S. destination for international travelers and the 7th most visited city in the U.S. domestically), and https://www.businessinsider.com/most-tourists-north-america-2018-12 (ranking Las Vegas the 4th most visited U.S. destination and 28th overall globally).

29.     For example, between June 2012 and April 2014, Flowerhorn and its Affiliates ran approximately *9,000 to 10,000* television and radio advertisement using the Marks on NBC affiliates, its sub-network COZI TV, XM radio and various other outlets, including ads on NBC's *Sunday Night Football* and sponsoring the Las Vegas local NBC affiliate's live New Year's Eve countdown for 2013 and 2014.

30.     Flowerhorn and its Affiliates have also extensively advertised the Marks and their associated Services via email blasts, print advertising (e.g. in restaurant guides and flyers at events such as the Super Bowl, Fiesta Bowl, U.S. Open of Surfing) and event sponsorships and attendance (e.g. "Taste of" events in its various cities, and events like the upcoming World Pride Food Festival in NYC, where an estimated 2.5M will attend).

31.     As is the case with most modern businesses, the importance of Internet and social media to Flowerhorn and its Affiliates' business has grown exponentially over the past 10 years. Flowerhorn and its Affiliates' online presence and advertising has grown exponentially as a result, along with their locations, overall marketing expenditures and gross and net sales -- all of which is evidence of the growing renown of the Marks and their association with their Services.

32.     For example, Flowerhorn and its Affiliates extensively promote the Marks and associated Services through Flowerhorn's website, https://www.hotnjuicycrawfish.com (the "Website").

33.     In 2017, the Website had just over 466,000 unique (i.e. non-repeat) visitors, with almost 635,000 "sessions" (i.e. total visits, whether by new or repeat visitors). In 2018, over 589,000 unique visitors visited the Website, with more than 834,000 sessions. Currently, the Website is on pace to reach over 926,000 unique visitors and over 1.3M sessions in 2019, a nearly 100% increase in just two years.

34.     Flowerhorn and its Affiliates also extensively promote the Marks and associated Services on Facebook, Twitter and Instagram.

35.     In 2017, there were 7,873,316 "organic impressions"[7] for Flowerhorn and its Affiliates' Facebook posts/ads, and 515,005 "engagements" with those posts/ads (e.g. likes, comments, shares).   In 2018, the same numbers were 20,926,936 organic impressions with 556,293 engagements.   Using the first three months of 2019 to extrapolate for the entire year, there should be 23,619,992 organic impressions with 522,628 engagements.

36.     Moreover, Flowerhorn's main Facebook page has more than 240,000 followers, which is unique for restaurants.

37.     In 2017, Flowerhorn and its Affiliates' "Tweets" utilizing the Marks were seen 155,957 times and "engaged with" (e.g. re-tweeted, marked as favorites, replied to, resulted in a "click" on the Website URL used in the Tweet, resulted in a click on a "hashtag"[8] used in the Tweet, etc.) nearly 3,500 times.   In 2018, their Tweets were seen 218,409 times and engaged with on 4,009 occasions.   In 2019, however, Flowerhorn and its Affiliates' Tweets are on pace to be seen 687,700 times and engaged with on nearly 8,000 occasions -- a nearly 300% increase in views over a three year period.

38.     In 2018, Flowerhorn and its Affiliates' Instagram posts utilizing the Marks were displayed 1,046,619 times, engaged with 43,827 times and gained 15,000 followers.   In 2019, those numbers are on pace to be 2,140,000 displays, 85,932 engagements and 18,171 followers, and increase of over 200%.

_____

[7] Organic impressions, in Facebook parlance, are effectively unpaid displays -- in other words, the number of times Plaintiff's posts were shown on Facebook without it having to pay for those displays.   That number, however, doesn't track the amount of times they were actually viewed.

[8] Plaintiff and its Affiliates' use of hashtags as a source identifier in social media is explained in more detail in paragraph 34 below.

39.     Flowerhorn and its Affiliates also utilize the Marks as "hashtags" on Facebook, Twitter and Instagram to identify and promote their restaurant services.[9]     These hashtags include #HotNJuicyCrawfish and #HotNJuicy. See, e.g., Exhibit 5.

40.     Flowerhorn's Marks and associated services have also enjoyed an extensive array of third-party promotions.  Specifically, the Marks and associated services have independently been and continue to be advertised/featured on an unpaid basis:

- in scores of print and electronic articles available around the globe, including articles from ABC News, The Washington Post, The Huffington Post, Thrillist, Chowhound, US Magazine, The Orlando Sentinel, Orlando Weekly, Las Vegas Sun, The Phoenix New Times, Las Vegas Weekly, Timeout Los Angeles, and NBC Los Angeles;

- on television shows such as the Travel Channel's "Man v. Food" and the Cooking Channel's "Unique Eats;"

- in various youtube.com channels and blogs with thousands of views; and

- in numerous celebrity posts, Tweets and "tags."

Most of these unpaid sources are boundary-less and can be seen by millions of prospective consumers across the globe.[10] (A true and correct summary of these free advertising/promotional sources, as well as others, has been attached hereto as Exhibit 6).

41.     The impact of a celebrity or social media "influencer" tagging or otherwise referencing a business (positively or negatively) can be profound.  For example, one of many

---

[9] On Twitter, users employ the hashtag symbol (#) prior to a keyword or phrase in their Tweet to categorize those Tweets and help them show more easily in Twitter's search function. Clicking or tapping on a hashtagged word in any message shows the viewer other Tweets that include that hashtag. Hashtagged words that become very popular are often Trending Topics.  See https://help.twitter.com/en/using-twitter/how-to-use-hashtags

[10] As one example, *The Washington Post* touts that it reaches more than 900,000 print readers every week (daily and Sunday) and that its digital content reaches more than **66 million unique visitors** across the United States, https://www.washingtonpost.com/wp-stat/ad/public/static/media_kit/16-2980-01-Gen.pdf?noredirect=on.     As another example, The Huffington Post has been visited **86.36M** times over a six month period. See https://www.similarweb.com/website/huffingtonpost.com#overview.

celebrities who has referenced "HOT N JUICY"™ on Instagram or Twitter, model and author Chrissy Tiegen, has approximately *23.5M* Instagram "followers" who may see any one of her given posts. See https://www.instagram.com/chrissyteigen/?hl=en. (A true and correct copy of Ms. Tiegen's post is attached hereto as Exhibit 7).

42.     The Marks have also been seen tens of thousands of times on customer review sites such as Yelp, Google, Trip Advisor, Zomato, Facebook, Instagram and Foursquare, in connection with customers' discussion of Flowerhorn and its Affiliates' Services.   The fine reputation of and good will associated with the Marks and associated Services has been enhanced and furthered by the overwhelmingly positive reviews on such sites.

43.     The unpaid broadcasts, articles and posts referenced above are further evidence of the renown of and goodwill associated with the Marks and the Services, as is the fact that Flowerhorn and its Affiliates have won numerous dining awards, including but not limited to Best Seafood in Las Vegas each year for 2016, 2017 and 2018.     See, e.g. https://bestoflasvegas.com/listing/k:hot-n-juicy-crawfish.[11]

The Unregistered Marks Acquire Distinctiveness

44.     In large part because of the foregoing efforts to promote the Marks throughout the United States and beyond, the restaurants operating under the Marks have grown from a single location in Las Vegas in 2007 to 14 locations currently; the gross sales for the restaurants during that same time period have grown from $52,799 in 2007 to nearly $36M in 2018.

45.     Up until Defendants' acts of infringement, set forth below, Flowerhorn and its Affiliates' use of the Marks in connection with their Services has been continued and exclusive.

---

[11] Other dining awards and accolades are referenced in Exhibit 6, attached hereto.

46.     As result of Flowerhorn and its Affiliates' extensive, exclusive and continual use, and widespread promotion and advertising, of the Marks as aforesaid, they now enjoy widespread consumer recognition and goodwill throughout the United States and beyond.  The Marks and hashtags have also acquired distinctiveness/secondary meaning and now serve as a clear indicator of the single source of Flowerhorn's and its Affiliates' Cajun seafood restaurant services in the minds of consumers.

47.     As further evidence of that fact and as set forth above, consumers and third parties now also routinely refer to Flowerhorn and its Affiliates/ restaurants as "HOT N JUICY"™ or "HNJ"®  (True and correct copies of such references are attached hereto as Exhibit 8; see also Exhibits 4, 7).

48.     As further evidence of consumer recognition of and the goodwill associated with the Marks and Services, franchise interest in "HOT N JUICY CRAWFISH"™ restaurants has grown exponentially along with their existing sales and locations.

49.     In fact, Plaintiffs and the Affiliates have had over 1,000 requests for information about "HOT N JUICY CRAWFISH"™ franchises from people across the United States and worldwide.  There have been approximately 350 such requests from than 12 other countries around the world, in the last several months alone, including but not limited to approximately 20 requests from people  interested in opening franchises in Chicago.

50.     As a result, Plaintiff's franchising affiliate, HNJ Franchising, Inc. has now registered to offer restaurant franchises under the Marks in 45 of the 50 states, including Illinois.

<u>Defendants' Infringement of the Marks</u>

51.    On or about December 12, 2018, Defendants opened their first casual Cajun seafood restaurant in Tinley Park, Illinois.

52.    At the same time, Defendants began using four service marks (collectively, the "Offending Marks") in commerce to designate the source of its restaurant services: three word marks, "HOT n JUICY CRAB," "HOT n JUICY" and "HNJC;" and this logo:



53.    Defendants are currently advertising the April 2019 opening of a second "HOT n JUICY CRAB" casual Cajun seafood restaurant in Evergreen Park, Illinois. See https://www.hotnjuicycrab.com/ (the "Offending Website").

54.    Defendants use the Offending Marks: on exterior and interior signage, on menus; on the Offending Website; in email addresses (e.g. info@hotnjuicycrab.com); on social media like Twitter (@CrabHot); and, on information and belief, glassware and employee clothing. (True and correct examples of such use are attached hereto as <u>Group Exhibit 9</u>).

55.     Defendants' first "HOT n JUICY CRAB" casual Cajun seafood restaurant offers almost exactly the same services and products as Flowerhorn and its Affiliates, though of lesser quality.[12]

56.     Specifically, Defendants' "HOT n JUICY CRAB" restaurant features Cajun seafood "boils" with crab, lobster, shrimp, clams and/or crawfish by the pound and choice of seasoning.  The boils typically include sausage, corn and/or potatoes and are served in see-through plastic bags.    Defendants' choices of seasoning similarly include: (a) Crab House Cajun; (b) Garlic Butter; and (c) Lemon Pepper.  Moreover, each of Defendants' spices come in four different spice levels, ranging from Mild to Insanely Hot.    (A true and correct copy of Defendants' online menu is attached hereto as Exhibit 10 at pp. 3-4).[13]

57.     Defendants' "HOT n JUICY CRAB" restaurant also offers, among other things: appetizers, such as raw oysters, fried shrimp, chicken wings, calamari, mozzarella sticks, fritters, sweet potato fries, Cajun fries and etouffee; baskets of fried shrimp, catfish, soft shell crab and chicken; and "TWO HANDED PO' BOYS" with catfish, crawfish, shrimp, chicken and soft shell crab. Id. at pp.1-2, 5-6.

58.     Incredibly, Defendants' "HOT n JUICY CRAB" restaurant even offers a "QUICKIE LUNCH DEAL" Monday through Friday, 12-4 p.m., consisting of any "Po'boy" with aside of Cajun Fries and a soda. Id. at pp. 6-7; Exhibit 9 at p. 4.  Defendants' deal, however, is $12.99 instead of $12. Id.[14]

---

[12] For example, Plaintiff's overall Yelp rating as of the time of this Complaint was 4 out of 5 stars, while Defendants' was 2.5 out of 5 stars.

[13] The in-store version of Defendants' menu is included in Exhibit 9 at pp. 2-5.

[14] Defendants' have further copied Plaintiff and its Affiliates' use of sexual innuendo by labeling the dessert section of their menu as "Sensuous Treats." See Exhibit 10 at p.7.

59.     In addition to advertising on the Offending Website, Defendants (like Flowerhorn and its Affiliates) promote the Offending Marks on Twitter, Facebook and, on information and belief, Instagram.

60.     In particular, Defendants use Flowerhorn's Marks and hashtags to identify and promote its inferior services on social media, including #HotNJuicy and #hotnjuicy.  See, e.g. Exhibit 11.  *In fact, when a consumer clicks on the #hotnjuicy hashtags on Defendants' Facebook page, the consumer gets routed to numerous Facebook posts by Flowerhorn and its Affiliates using the same hashtags.*  The same thing happens when a consumer clicks on the same hashtags on Defendants' Tweets and Instagram posts.


Likelihood of and Actual Confusion

61.     Defendants' aforesaid use of the Offending Marks "HOT n JUICY CRAB" and hashtags in connection with its Cajun seafood restaurant services is creating a likelihood of consumer confusion as to the source, sponsorship or approval of its services and those of Flowerhorn and its Affiliates and/or suggesting an affiliation between Defendants and Flowerhorn and its Affiliates that does not exist.

62.     First, the Offending Marks are similar in appearance and suggestion.

63.     Specifically, Flowerhorn's word marks are "HOT N JUICY CRAWFISH,"™ "HOT N JUICY,"™ and "HNJ."®  Thus, the only difference between these Flowerhorn word marks and Defendants' three offending word marks, "HOT n JUICY CRAB," "HOT n JUICY" and "HNJC" are:  the latter's use of a lower case "n" between "HOT" and "JUICY" in the first two word marks; Flowerhorn and its Affiliates' use of the "CRAWFISH" and Defendants' use

of "CRAB" in their first word marks; and Defendants' addition of the letter "C" to "HNJ" with respect to the third word marks.

64.     None of these distinctions are significant or likely to distinguish Defendants' services from Flowerhorn and its Affiliates' services in the minds of consumers; on the contrary, the word marks are substantively identical or, in some cases, perfectly identical, as are the hashtags.[15]

65.     Additionally, and although the parties' respective logos (apart from shape) may be different in overall impression, each of them use the component word marks referenced above, which are, again, substantively identical.

66.     Moreover, and as set forth above, the parties' respective Cajun seafood restaurant services are virtually identical apart from quality: they offer exactly the same kinds of menu items, the same basic types of seasonings for those items, utilize the same accoutrements with the seafood boils (sausage, corn and potatoes) and utilize the same kind of presentation for their food.

67.     Although the parties are not yet direct competitors in Chicago (though HNJ Group has now registered to franchise "HOT N JUICY CRAWFISH"™ restaurants here), the area and manner of use of their respective marks overlap considerably, as the evidence of actual confusion set forth below confirms.

68.     Indeed, the facts set forth in paragraph 74 below demonstrate that Flowerhorn and its Affiliates in fact offer the services to some of the same consumers as Defendants.

69.     Additionally, both parties utilize and actively promote their marks in the boundary-less commercial mediums of the 21th Century: on the World Wide Web, on social

---

[15] The same is true for HNJ Group's "QUICKIE LUNCH DEAL"™ and "TWO HANDED PO' BOYS"® marks, which Defendants' have copied verbatim, as set forth above.

media like Twitter, Facebook and Instagram, and utilize the same hashtags to promote the services under the marks.

70.     As set forth above, and as demonstrated further by the actual confusion evidence set forth below, millions of travelers from the United States and around the globe have come to Las Vegas alone, many becoming familiar with the "HOT N JUICY CRAWFISH"™ restaurants and the Marks during their visits.[16]

71.     In fact, according to the Las Vegas Convention and Visitors' Association, Chicago is the 4th largest "feeder" city in the U.S. for Las Vegas, meaning more than 850,000 visitors to Las Vegas originated from Chicagoland area airports in 2017. https://assets.simpleviewcms.com/simpleview/image/upload/v1/clients/lasvegas/2017_Top_Air_Markets_City_0572e5f5-d93b-4ed0-8711-31d22aaaa7d5.pdf.

72.     The degree of care likely to be exercised by consumers of casual Cajun seafood restaurant services is low.   First, there is no reason to believe that such consumers are particularly sophisticated, though individual patrons no doubt range from the unsophisticated to the highly sophisticated in terms of the casual dining public.   Second, the decision to eat out at a casual restaurant is one that is made frequently and does not involve significant expenditure of money relative to, for example, eating at a Michelin four start restaurant or even buying a smart phone.   Indeed, the parties' respective restaurant services offer food items that begin at $3.99 for appetizers.  See, e.g. Exhibit 1 at p. 1 and Exhibit 10, at p. 1.

73.     As set forth above, Plaintiffs' unregistered Marks have now acquired distinctiveness/secondary meaning and are strong.   Additionally, Flowerhorn's registered mark "HNJ®" is presumptively strong and distinct by virtue of its registration.

---

[16] Some customers from around the United States and around the globe have even professed to fly to Las Vegas for the sole purpose of eating at "HOT N JUICY CRAWFISH"™ restaurants.

74. As further evidence of the wide geographic renown and reach of the Marks, their association with Flowerhorn and its Affiliates' Services, and the fact that Flowerhorn and its Affiliates offer their Services to some of the same consumers as Defendants, *there are multiple instances of actual confusion on the part of local consumers between the parties' respective casual Cajun seafood restaurants – confusion occasioned by Defendants' use of the Offending Marks as set forth above.*

75. More specifically:

- In one bad Google local review of Defendants' restaurant, the reviewer notes that the restaurant was "One of our favorite places in Vegas" and that after a poor experience at Defendants' restaurant he "couldn't wait to head [back to] Vegas though." (A true and correct copy of the review is attached hereto as Exhibit 12). Defendants, however, do not have a Las Vegas location, whereas Flowerhorn and its Affiliates' have four;

- In another poor Google review, the local reviewer said "I've been to Hot n Juicy in Florida, Las Vegas and NYC and they were all consistent with the food, flavor experience, etc. I have to say that I'm highly disappointed [here]… I will be going back … and visit the real Hot n Juicy restaurants in the cities I reference earlier… Ugh. If you're familiar with Hot n Juicy please lower your expectations when coming here." *To make matters worse, the owner had an opportunity to dispel the confusion by saying that his restaurant was not affiliated with Flowerhorn and its Affiliates, but did not even address the subject in his response.* (A true and correct copy of the review is attached hereto as Exhibit 13);

- In a middling Yelp review of Defendants, a reviewer stated that she "came to this restaurant because a family member told me they went to this restaurant in Las Vegas and it was phenomenal." In the owner's response, however, he again avoided the topic of confusion with Flowerhorn and its Affiliates' Las Vegas locations. (A true and correct copy of the review is attached hereto as Exhibit 14 at p. 2);

- In another poor Yelp review of Defendants, a reviewer explicitly admitted to confusion, saying: "Please do not confuse this place with Hot N Juicy Crawfish that are located in DC and Vegas. This is not that. *I made that very mistake so people need to know*." (emphasis added)(A true and correct copy of the review is attached hereto as Exhibit 15 at p.2);

- In another poor Yelp review of Defendants, the reviewer stated that it was "a copycat of 'Hot and Juicy Crawfish' in CALI and Vegas," but that "they are no where (*sic*) to compare." (See <u>Exhibit 14</u> at pp. 2-3); and

- Finally, at least one consumer has emailed Plaintiffs at <u>info@hotnjuicycrawfish.com</u> to complain about service at Defendants' restaurant.

76.     Additionally, Google searches of "HOT N JUICY" further illustrate the likelihood of confusion and actual confusion, as does Defendants' use of the #hotnjuicy hashtags.

77.     For example, a recent Google search run for "Hot N Juicy" brought up both "Hot N Juicy Crawfish" and "Hot N Juicy Crab." (A true and correct copy of the Google search, which was run on April 6, 2019, is attached hereto as <u>Exhibit 16</u>). More importantly, however, the searches resulted in references to "Hot N Juicy Chicago, IL" and "Hot N Juicy Crawfish Chicago, IL" when Flowerhorn and its Affiliates do not yet have a location here. *Id.* ***Moreover, the search produced a video referencing "Hot N Juicy Crawfish in Las Vegas First Time," but with a picture of the video with displaying Defendants' Offending Marks. Id.*[17]

78.     From the foregoing, it is apparent that Defendants' infringement is in fact intentional and that they are attempting to palm off their services as those of Flowerhorn and its Affiliates. Not only have Defendants copied three of Plaintiffs' word marks verbatim ("HOT n JUICY," "QUICKIE LUNCH DEAL" and "TWO HANDED PO' BOYS"), they have used slight variations of the remaining two word marks ("HOT n JUICY CRAB" and "HNJC") and appropriated Flowerhorn's hashtags, all in an effort to dupe consumers into believing there is an affiliation between their respective services.

---

[17] The actual video, however, is at one of Flowerhorn and its Affiliates' Las Vegas restaurant.

79.     Indeed, when *local consumers directly apprised Defendants' owner of their confusion in writing, he chose to remain silent and do nothing to correct or dispel it.*

80.     On information and belief, Defendants' owners or agents have visited one or more of Flowerhorn and its Affiliates' "HOT N JUICY CRAWFISH"™ restaurants in the past to sample their food and examine their menus, décor, Marks etc. in order to better copy them.

81.     In light of the above, on or about March 27, 2019, counsel for Plaintiffs in writing demanded that Defendants immediately cease using the Offending Marks and/or any other deceptively similar terms to the Marks in connection with seafood restaurant services, and to contact undersigned counsel by the close of business on Friday, April 5, 2019.  A true and correct copy of that "cease and desist" letter is attached hereto as Exhibit 17.

82.     Defendants have not substantively responded to this demand.

## COUNT I – UNFAIR COMPETITION
### UNFAIR COMPETITION PER 15 U.S.C. §1125(A)

83.     Plaintiffs incorporate paragraphs 1 to 82 above, as if fully stated herein.

84.     Each of the Marks other than HNJ® have acquired distinctiveness/secondary meaning as well as immeasurable good will among consumers of Cajun seafood restaurant services throughout the United States, and serve to identify a single source for Flowerhorn and its Affiliates' Services.

85.     Section 1125(a) of the Lanham Act precludes the use in commerce of any word, term or name likely to cause confusion as to the affiliation, connection or association between two persons or entities, or as to the origin, sponsorship or approval of a person's goods or services.  15 U.S.C. §1125(a).

86.     Defendants' use of the Offending Marks and hashtags in connection with nearly identical Cajun seafood restaurant services constitutes infringement of Plaintiffs' rights in the Marks, as it has actually caused and is likely to continue to cause confusion or mistake, or to deceive, as to the origin, sponsorship or approval of Defendants' services, in violation of 15 U.S.C. § 1125(a).

87.     Additionally, Defendants' use of the Offending Marks and hashtags in connection with nearly identical Cajun seafood restaurant services has actually caused and is likely to continue to cause confusion or mistake as to an affiliation between Flowerhorn and its Affiliates on the one hand and Defendants on the other, when none exists.

88.     Defendants' actions as aforesaid have caused and, unless restrained and enjoined, will continue to cause irreparable harm, damage and injury to Plaintiffs, for which they have no adequate remedy at law.   This includes damage to the goodwill associated with the Marks, confusion and loss of business that will be difficult or impossible to calculate.

89.     Indeed, should Defendants be permitted to open their second location, the actual confusion and damage to goodwill referenced above will only be exacerbated.

90.     Defendants have knowingly and intentionally used the Offending Marks and hashtags with a bad faith intent to trade upon the goodwill of Plaintiffs' Marks, and continue to do so notwithstanding Plaintiffs putting them on notice of its rights in the Marks and notwithstanding their knowledge of actual local consumer confusion.

91.     Defendants' willful and defiant disregard of Plaintiffs' rights in the Marks makes this case an exceptional case for which an award of Plaintiffs' reasonable attorneys' fees and exemplary damages is warranted.

## COUNT II – TRADEMARK INFRINGEMENT
### PER 15 U.S.C. §1114(1)(A)

92.     Plaintiffs incorporate paragraphs 1 to 91 above, as if fully stated herein.

93.     The HNJ® mark is distinctive and serves as a single source identifier for Flowerhorn and its Affiliates' Cajun seafood restaurant services.

94.     In relevant part, Section 1114(1)(a) of the Lanham Act precludes Defendants, without Flowerhorn's consent, from using in commerce any reproduction or colorable imitation of this registered mark, in the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

95.     Defendants' use of the Offending Mark "HNJC" in connection with nearly identical Cajun seafood restaurant services constitutes infringement of Flowerhorn's rights in this registered mark, as it likely to cause confusion or mistake, or to deceive, as to the origin, sponsorship or approval of Defendants' services, in violation of 15 U.S.C. § 1114(1)(a).

96.     Defendants' actions as aforesaid have caused and, unless restrained and enjoined, will continue to cause irreparable harm, damage and injury to Flowerhorn and its Affiliates, for which they have no adequate remedy at law.  This includes damage to the goodwill associated with the mark, confusion and loss of business that will be difficult or impossible to calculate.

97.     Indeed, should Defendants be permitted to open their second location, the actual confusion and damage to goodwill referenced above will only be exacerbated.

98.     Defendants have knowingly and intentionally used the Offending Mark "HNJC" s with a bad faith intent to trade upon the goodwill of Flowerhorn's registered mark, and continue to do so notwithstanding Plaintiffs putting them on notice of its rights in the registered mark and notwithstanding their knowledge of actual local consumer confusion.

99.     Defendants' willful and defiant disregard of Flowerhorn and its Affiliates rights in the registered mark makes this case an exceptional case for which an award of Plaintiffs' reasonable attorneys' fees and exemplary damages is warranted.

### COUNT III
### ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### 815 ILCS 510

100.    Plaintiffs incorporate paragraphs 1 to 102 above, as if fully stated herein.

101.    Section 510/2 of the Illinois Uniform Deceptive Trade Practices Act provides in relevant part:

A person engages in a deceptive trade practice when, in the course of his or her business . . . the person:

(1)     passes off goods or services as those of another;

(2)     causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(3)     causes likelihood of confusion or of misunderstanding as to the affiliation, connection or association with or certification by another; ... or

(12)    engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

815 ILCS 510/2.

102.    Defendants' use of the Offending Marks and hashtags to provide the same Cajun seafood restaurant services as Flowerhorn and its Affiliates, to some of the same consumers is a violation of the Illinois Uniform Deceptive Trade Practices Act.

103.    Additionally, Defendants' use of the Offending Marks and hashtags as aforesaid with respect to their Cajun seafood restaurant services represents an attempt to pass off their services as those of Flowerhorn and its Affiliates.

104.    Defendants' violations have caused actual and ascertainable damages to Plaintiffs in an amount yet to be fully established, as well as the irreparable harm for which there is no adequate remedy at law referenced above.

105.    Defendants' violations were at all times intentional and willful as stated herein.

### COUNT IV
### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 ILCS 505

106.    Plaintiffs incorporate paragraphs 1 to 105 above, as if fully stated herein.

107.    Section 505/2 of the Illinois Consumer Fraud and Deceptive Business Practices Act provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to. . . the use or employment or any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person in fact has been misled, deceived or damaged thereby.

815     ILCS 505/2.

108.    Defendants have used deceptive acts or practices as described in Section 2 of the Uniform Deceptive Trade Practices Act, as more fully described above.

109.    Defendants' violations have caused actual and ascertainable damages to Plaintiffs in an amount yet to be fully established, as well as the irreparable harm for which there is no adequate remedy at law referenced above.

110.    Defendants' violations were at all times intentional and willful as stated herein.

### COUNT V
### COMMON LAW UNFAIR COMPETITION

111.    Plaintiffs incorporate paragraphs 1 to 110 above, as if fully stated herein.

112.    Defendants' use, without consent, of words and names identical and/or confusingly similar to Plaintiffs' Marks in connection with the same Cajun seafood restaurant

services, to some of the same consumers:

(a)     was an attempt to pass off Defendants' services as those of Flowerhorn and its Affiliates;

(b)     caused, and continues to cause, both actual confusion and a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of both Flowerhorn and its Affiliates' and Defendants' respective services;

(c)     caused, and continues to cause, both actual confusion and a likelihood of confusion or of misunderstanding as to affiliation, connection or association between the parties; and/or

(d)     created, and continues to create, both actual confusion and a likelihood of confusion or misunderstanding among consumers between Flowerhorn and its Affiliates Services and those of Defendants.

113.    Defendants have intentionally and willfully engaged in unfair competition in that their use of names and words confusingly similar to Plaintiffs' Marks to provide the same Services as Flowerhorn and its Affiliates to some of the same consumers creates actual and likely confusion in the public mind, and misappropriates Plaintiffs' rights and the goodwill they have established in the Marks, all to the irreparable injury of Plaintiffs.

114.    Defendants' infringement constitutes inequitable pirating of the fruits of Plaintiffs and their Affiliates' labor and constitutes unfair competition in violation of Illinois common law.

115.    As aforesaid, Defendants' acts of unfair competition were done knowingly, intentionally and willfully.

116.    Defendants' acts have caused, and will continue to cause, damages and irreparable harm for which a monetary remedy is not adequate, unless enjoined by this Court.

WHEREFORE, Plaintiff prays as follows:

1. As to Count I, that the Court: (a) find that Defendants have violated 15 § U.S.C. 1125(a); (b) award Plaintiffs their actual damages and/or the amount of Defendants' profits proven at trial, along with an order of costs; (c) award Plaintiffs the amount of its reasonable attorneys' fees; and (d) any additional relief in Plaintiffs' favor as the Court finds equitable under the circumstances;

2. As to Count II, that the Court: (a) find that Defendants have violated 15 § U.S.C. 1114(1)(a); (b) award Flowerhorn its actual damages and/or the amount of Defendants' profits proven at trial, along with an order of costs; (c) award Flowerhorn the amount of its reasonable attorneys' fees; and (d) any additional relief in Flowerhorn's  favor as the Court finds equitable under the circumstances;

3. As to Count III, that the Court: (a) find that Defendants have violated 815 ILCS 510 *et seq*.; (b) award Plaintiffs their actual damages proven at trial and/or the amount of Defendants' profits; (c) award Plaintiffs the amount of their reasonable attorneys' fees and costs; and (d) such additional relief in Plaintiffs' favor as the Court finds equitable under the circumstances

4. As to Count IV, that the Court: (a) find that Defendants have violated 815 ILCS 505 *et seq*.; (b) award Plaintiffs their actual damages proven at trial and/or the amount of Defendants' profits; (c) award punitive damages against Defendants for their willful and wanton behavior; (d) award Plaintiffs the amount of their reasonable attorneys' fees and costs; and (e) such additional relief in Plaintiffs' favor as the Court finds equitable under the circumstances;

5. As to Count V, that the Court: (a) find that Defendants have engaged in unfair competition in violation of Illinois common law; (b) award Plaintiffs their actual damages and

costs proven at trial and/or the amount of Defendants' profits; (c) award punitive damages against Defendants for their willful and wanton behavior; and (d) such additional relief in Plaintiffs' favor as the Court finds equitable under the circumstances; and

6.     As to all counts, that the Court grant Plaintiffs an emergency temporary restraining order, as well as preliminary and permanent injunctive relief against Defendants and all those in active concert with them who receive actual notice of the order: enjoining them from (a) directly or indirectly employing the Marks, the hashtags, the Offending Marks and/or any confusingly similar terms thereto with respect to the offer or provision of restaurant services, including but not limited to use as a name, slogan, design or logo, or in or on advertisements, marketing materials, promotions, communications, websites or emails; and/or (b) opening the Evergreen Park location the Marks, the hashtags, the Offending Marks and/or any confusingly similar terms thereto; and

Respectfully submitted,

FLOWERHORN, INC. d/b/a "HOT
N JUICY CRAWFISH" and HNJ
GROUP, INC. d/b/a "HOT N JUICY
CRAWFISH,"

By:     /s/ Robert H. Smeltzer, Esq.
        One of their attorneys

Robert H. Smeltzer
HOWARD & HOWARD ATTORNEYS PLLC
200 S. Michigan Ave. #1100
Chicago, IL  60604
(312) 372-4000
rsmeltzer@howardandhoward.com

## **CERTIFICATE OF FILING AND SERVICE**

The undersigned attorney, under penalties of perjury, hereby certifies that I filed the

foregoing Verified Complaint for Injunctive and Other Relief electronically via the Court's ECF

system prior to midnight on April 8, 2019, and also served a copy of it via email on the same

date and on the following attorneys:

Lisa A. Harkins, Esq.
Flener IP Law
77 W Washington Street
Suite 800
Chicago, Illinois 60602
Email: lharkins@fleneriplaw.com

/s  Robert H. Smeltzer

## <u>VERIFICATION</u>

I, Laina Vo, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the factual allegations set forth in the foregoing Verified Complaint for Injunctive and Other Relief are true and correct, except as to those matters set forth on information and belief, and with respect to those, I state that I verily believe the same to be true.

Executed on April 5, 2019

4823-0487-7457, v. 1

18