IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FLOWERHORN, INC. d/b/a "HOT N JUICY CRAWFISH," a foreign corporation, and HNJ GROUP, INC. d/b/a "HOT N JUICY CRAWFISH," a foreign corporation,<br><br>   Plaintiffs,<br><br>   v.<br><br>HOT N JUICY CRAB TINLEY PARK, INC., a domestic corporation, and HOT N JUICY CRAB INCORPORATED, a domestic corporation,<br><br>   Defendants. | No. 1:19 -cv- 02372<br>Hon. Gary Feinerman<br>Magistrate Judge J. Cummings |

**MOTION AND MEMORANDUM IN SUPPORT OF PLAINTIFF'S
REQUEST FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER**

  Plaintiffs Flowerhorn, Inc. d/b/a HOT N JUICY CRAWFISH and HNJ Group, Inc. ("HNJ Group") d/b/a HOT N JUICY CRAWFISH, (collectively, "Plaintiffs"), by their undersigned counsel and pursuant to Fed.R.Civ.P. 64, hereby move for a Temporary Restraining Order against Defendants HOT N JUICY CRAB TINLEY PARK, INC. and HOT N JUICY CRAB INCORPORATED (collectively, "Defendants"). In support thereof, Plaintiffs state:

**FACTS ALLEGED IN THE VERIFIED COMPLAINT**

  Flowerhorn's Use and Wide Promotion of the Marks

  In 2007, Flowerhorn, Inc. founded a casual Cajun seafood restaurant under the d/b/a "HOT N JUICY CRAWFISH" in Las Vegas, Nevada. Since that time, it and 13 other affiliated restaurants (collectively, Flowerhorn, Inc. and its 13 affiliates will be referred to as "Flowerhorn") have – either directly or through licenses -- utilized six service marks in commerce to indicate the

1

source of their Cajun seafood restaurant services (the "Services").[1] The Marks are the word marks "HOT N JUICY CRAWFISH,"™ "HOT N JUICY,"™ "HNJ"®, "QUICKIE LUNCH DEAL"™ and "TWO HANDED PO' BOY,"™ and a circular logo including the first three of the aforesaid word marks (collectively, the "Marks"). (VC at ¶¶2-4, 10 and 12). More specifically, Flowerhorn has been using the word marks "HOT N JUICY CRAWFISH"™ and "HOT N JUICY"™ since 2007 (VC at ¶¶18-19); the registered mark HNJ"® and logo since April of 2011. (VC at ¶¶20-21); the word mark "QUICKIE LUNCH DEAL"™ since June 1, 2013; and "TWO HANDED PO' BOY"™ since November 1, 2011. (VC at ¶¶22-23). Apart from Defendants' infringement of the Marks, that use had been exclusive and continuous in connection with the Services. (VC at ¶45).

Each of the 14 "HOT N JUICY CRAWFISH"™ restaurants (which customers and the media also refer to simply as "HOT N JUICY"™ or HNJ®),[2] utilize the Marks: on exterior and interior store signage; on menus; on employee clothing; on calendars; on glassware; on bibs; in social media; on the website https://www.hotnjuicycrawfish.com (the "Website"); in email communications (e.g. info@hotnjuicycrawfish.com); and in print, electronic and television advertising (e.g. email blasts, print ads, flyers and LED screens). (VC at ¶¶13-17, 24, 47).

There are four "HOT N JUICY CRAWFISH"™ restaurants in the Las Vegas, Nevada, area, two in Southern California, two in New York, three in Arizona, one in Falls Church, Virginia, one in Washington D.C., and one in Orlando, Florida. The majority of them are located in close proximity to famous and highly-trafficked tourist spots, including: Planet Hollywood off the Las

---

[1] Flowerhorn, Inc. and HNJ Group share the same shareholder, and the latter was recently created to hold all of Flowerhorn, Inc.'s intellectual property, among other things. (VC, Doc. 1, at ¶ 4). As it stands now, however, Flowerhorn, Inc. owns the word marks "HOT N JUICY CRAWFISH,"™ "HOT N JUICY,"™ "HNJ"® as well as the logo, (VC at ¶11), but has to date assigned the "QUICKIE LUNCH DEAL"™ and "TWO HANDED PO' BOY"™ word marks to HNJ Group. *Id.* Flowerhorn Inc.'s affiliates currently utilize the Marks pursuant to licenses from both Plaintiffs, *id.* at ¶12, as Flowerhorn, Inc. licenses HNJ Group's two marks. In the near future, however, HNJ Group will own all of the Marks and license them back to affiliated entities and franchisees.

[2] For ease of reference, however, Flowerhorn's 14 restaurants will be referred to herein collectively as the "HOT N JUICY CRAWFISH"™ restaurants.

Vegas Strip; State Farm Stadium (home of the NFL's Phoenix Cardinals and host of The Fiesta Bowl, The College Football Playoff, two Super Bowls and a NFL Pro Bowl); the Sunset Strip in Hollywood, California; The National Zoo in Washington D.C.; and Sea World and Walt Disney World in Orlando, Florida. (VC at ¶¶13, 26-27). The "HOT N JUICY CRAWFISH"™ restaurants collectively host approximately 1.8 million customers per year, (VC at ¶25), all of whom are exposed to the Marks; countless additional millions are exposed to Marks on the restaurants' exteriors. (VC at ¶¶25, 27).

To further associate the Marks with their Services alone in the minds of consumers, Flowerhorn has spent more than $1.38M in television, print, electronic, Internet, social media and other advertising and promotion of the Marks. (VC at ¶28). This includes 9,000 to 10,000 television and radio advertisements, email blasts, print advertising (e.g. in restaurant guides and flyers at events such as the Super Bowl, the Fiesta Bowl and the U.S. Open of Surfing), event sponsorships and attendance (e.g. "Taste of" events in its various cities, and events like the upcoming World Pride Food Festival in NYC, where an estimated 2.5M will attend). (VC at ¶¶29-34).

Flowerhorn also widely promotes the Marks via the Website and social media, reaching millions on Facebook, Twitter and Instagram, including through the use of some Marks as "hashtags" (e.g. HotNJuicyCrawfish and #HotNJuicy). (VC at ¶¶31-39). These outlets are reaching consumers on an exponentially larger basis each year. For example, the Website is on pace to get nearly 1 million in unique visitors this year. Flowerhorn's posts and ads are on pace to be displayed on Facebook more than 23,000,000 times this year. Its Tweets are on pace to be seen more than 687,000 tweets this year, and its Instagram posts on pace for 2.1M displays. *Id.*

3

As the engagement numbers indicate, these are not just posts and ads that disappear into the ether, rather people are seeing them and reacting. (VC at ¶¶35, 37-38).

Perhaps more impressive is the free press that the "HOT N JUICY CRAWFISH"™ restaurants get: in scores of print and electronic articles available around the globe, including articles from ABC News, *The Washington Post*, *The Huffington Post*, *Thrillist, Chowhound, US Magazine*, *The Orlando Sentinel*, *Orlando Weekly*, *Las Vegas Sun*, *The Phoenix New Times, Las Vegas Weekly, Timeout Los Angeles*, and NBC Los Angeles; on television shows such as the Travel Channel's "Man v. Food" and the Cooking Channel's "Unique Eats;" on youtube.com channels and "vlogs" with thousands of views; and in numerous celebrity posts, Tweets and "tags." Most of these sources are boundary-less and can be seen by millions of prospective consumers across the globe. (VC at ¶40). One celebrity that "tagged" "HOT N JUICY"™ on Instagram, model and author Chrissy Tiegen, has approximately 23.5M Instagram "followers" there. (VC at ¶41).

Due in part to the aforesaid promotional efforts, the "HOT N JUICY CRAWFISH"™ restaurants have grown from a single location in Las Vegas in 2007 to 14 locations currently; the gross sales for the restaurants during that same time period have grown from $52,799 in 2007 to nearly $36M in 2018. (VC at ¶44). Franchise interest has grown exponentially as well, with Flowerhorn fielding over 1,000 franchise inquiries -- approximately 350 such requests from more than 12 countries in the last several months alone, including approximately 20 requests from potential Chicago franchisees. (VC at ¶¶48-49). In sum, the Marks and hashtags have acquired distinctiveness/secondary meaning, i.e. they now serve as a clear indicator of the single source of Flowerhorn's Services in the minds of consumers. (VC at ¶¶46).

Defendants' Infringement of the Marks

Defendants offer precisely the same casual Cajun seafood restaurant services as Flowerhorn and opened their first restaurant in Tinley Park, Illinois, on or about December 12, 2018. (VC at §51). Defendants utilize four confusingly similar service marks in connection with their Services: three word marks, "HOT n JUICY CRAB," "HOT n JUICY" and "HNJC;" and a circular logo employing the first word mark (collectively, the "Offending Marks"). (VC at §§51-52). Like the Marks, the Offending Marks are used on exterior and interior signage; on menus; on the Offending Website; in email addresses (e.g. info@hotnjuicycrab.com); on social media and other advertisements like Twitter (@CrabHot); and, on information and belief, glassware and employee clothing. (VC at §54). Defendants are about to open a second "HOT n JUICY CRAB" location in Evergreen Park, Illinois. (VC at §53).

Defendants' menu offerings are almost a mirror image of those of "HOT N JUICY CRAWFISH"™ restaurants (though of lesser quality[3]): both feature Cajun seafood "boils" with crab, lobster, shrimp, clams and/or crawfish by the pound and choice of seasoning; both typically include sausage, corn and/or potatoes and are served in see-through plastic bags; both offer almost the same choice of seasonings and in the same spice levels; both offer the same kinds of appetizers; both offer "TWO HANDED PO' BOYS" with catfish, crawfish, shrimp, chicken and soft shell crab; and, incredibly, both offer a "QUICKIE LUNCH DEAL" Monday through Friday, 12-4 p.m., consisting of any "Po'boy" with a side of Cajun Fries and a soda for around $12. (Compare VC ¶¶15-17, with ¶¶55-58 and Exs. 1 and 9-10).

In addition to advertising on the Offending Website, Defendants (like Flowerhorn) promote the Offending Marks on Twitter and Facebook, often using the #HotNJuicy and

---

[3] For example, Plaintiff's overall Yelp rating as of the time of this Complaint was 4 out of 5 stars, while Defendants' was 2.5 out of 5 stars. (VC at ¶¶55).

#hotnjuicy hashtags to do so. (VC at ¶¶59-60). ***In fact, when consumers click on the #hotnjuicy hashtags on Defendants' Facebook page, they get routed to numerous Facebook posts by Flowerhorn using the same hashtags.*** The same thing happens when a consumer clicks on the same hashtags on Defendants' Tweets and Instagram posts. (VC at ¶60). In sum, Defendants seem to have not only copied Plaintiffs' Marks, but nearly every important aspect of the "HOT N JUICY CRAWFISH"™ restaurants. Defendants' use of the Offending Marks in connection with the Services is not only likely to cause, but as set forth below, is already causing multiple instances of actual confusion among local consumers – confusion that will only exacerbate if Defendants open additional locations. (VC at ¶¶74-70). In fact, Defendants intend precisely that. (VC at ¶78).

## ARGUMENT

To obtain a temporary restraining order ("TRO") or preliminary injunction, Plaintiffs must show a "better than negligible chance of succeeding on the merits," and that it has "no adequate remedy at law and will suffer irreparable harm if a TRO is denied." *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001); *Ezell v. City of Chicago,* 651 F.3d 684, 694 (7th Cir. 2011); *also Meridian Mut. Ins. Co., v. Meridan Ins. Grp., Inc.,* 128 F.3d 1111, 114-15, 1120 (7th Cir. 1997). Regarding those merits, each of Plaintiffs' trademark infringement claims (whether registered or unregistered) and its related claims for unfair competition and deceptive business practices involve the same elements and proof. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 619 (7th Cir. 1993); *Spex, Inc. v. Joy of Spex, Inc.,* 847 F.Supp. 567, 579 (N.D. Ill. 1994); *Trans Union LLC v. Credit Research, Inc.,* 142 F.Supp.2d 1029, 1038 (N.D. Ill. 2001). They are that Plaintiffs: (1) have a protectable right in the asserted trademarks; and (2) Defendants' use of the same (or substantially similar or colorable imitations) marks are likely to cause

6

confusion. *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 673-74 (7th Cir. 2001); *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 638 n.8 (7th Cir. 2001). Plaintiffs can demonstrate both here.

### 1. *Plaintiffs Have Protectable Service Marks.*

Registration of a mark is *prima facie* evidence of a mark's validity. 15 U.S.C. § 1115(a); *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F. Supp. 2d 868, 879 (N.D. Ill. 2008). Moreover, five years of continuous registration and use can bar a claim of invalidation on lack of distinctiveness. *Park 'N Fly, Inc. v. Dollar Park 'N Fly*, 469 U.S. 189, 196 (1985); 15 U.S.C. § 1065. Flowerhorn's HNJ® mark is therefore not only presumed valid and distinctive, but incontestable. Further, and assuming for present purposes only that Plaintiffs' remaining word marks[4] are descriptive, those Marks have acquired distinctiveness/secondary meaning over the past 6-12 years, i.e. "a mental association in the buyers' minds between [them] and a single source of the [services]." *Packman,* 267 F.3d at 641. Secondary meaning can be established through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and evidence of intentional copying. *Id.* (citations omitted).

Specifically, and although Plaintiffs have not performed any consumer surveys to date, consideration of *all six of the remaining factors* show Plaintiff has much more than a negligible chance of success of establishing secondary meaning for each of the remaining four word Marks. *See, e.g.,* VC at ¶¶14-26 (exclusivity, length and manner of use); 28-43 (amount and manner of advertising); 25, 44 (volume of sales and number of customers); 12-13, 25-44, 70 (established

---

[4] Flowerhorn's logo is a composite mark, comprised of design and words. Plaintiff submits that logo is "unitary" and therefore distinctive; nevertheless, the word elements of the logo (apart from HNJ®), on which Plaintiffs claim Defendants infringe, are analyzed the same as the "HOT N JUICY CRAWFISH,"™ and "HOT N JUICY,"™ word marks discussed below.

7

place in the market);[5] 57-58, 60, 63, 66, (strongly supporting an inference of intentional copying); and 74-75 (direct consumer testimony).[6] In particular, the evidence of actual confusion from local Chicagoland consumers, where Flowerhorn does not yet have a restaurant, demonstrates that they associate the Marks, particularly "HOT N JUICY"™ and "HOT N JUICY CRAWFISH"™ with Flowerhorn's Services alone. *See International Kennel Club,* 846 F.2d at 1086 (finding that letters and telephone calls from confused consumers supported an inference of secondary meaning); *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 381 (7th Cir.1976)(actual confusion shows at least some amount of secondary meaning); *see also Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 728 (7th Cir.1998)(Wood, J., dissenting); *Simon Prop. Grp., L.P. v. mySimon, Inc.*, No. IP 99-1195-C H/G, 2001 WL 66408, at *10 (S.D. Ind. Jan. 24, 2001); *Vision Ctr. Northwest, Inc. v. Vision Value, LLC*, 07-cv-183, 2007 WL 3256647, *5-7 (N.D. Ind. Nov. 01, 2007). Similarly, the rational inference from their use of almost precisely the same Marks, hashtags, menu offerings in connection with precisely the same Services -- along with Defendants' refusal to dispel customer confusion (VC at – is that Defendants have knowingly and intentionally copied the same. And copying can be evidence of secondary if the Defendants' intent in copying is to confuse consumers and pass off his services as those of Flowerhorn. *See Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 663 (7th Cir.1995).

Indeed, the courts in this Circuit have found secondary meaning with less evidence, and without consumer surveys, proof of actual confusion or intentional copying. *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1086–87 (7th Cir. 1988)(finding the "amount

---

[5] The courts in this Circuit do not appear to consider this a discrete inquiry, but more like a composite of facts like sales, locations, and advertising. *See, e.g., Nelson/Weather-Rite, Inc. v. Leatherman Tool Grp., Inc.,* No. 93 C 2274, 1995 WL 669091, at *11 (N.D. Ill. Nov. 8, 1995)

[6]Due to space considerations, Plaintiffs will address these factors more fully during oral argument.

8

and manner of advertising" and the "length and manner of use" of the International Kennel Club name yields a better than negligible chance of establishing secondary meaning, notwithstanding only $60,000 in advertising); *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 906-7 (7th Cir.1986)(Plaintiff's use of the label "chocolate fudge" for 13 years, combined with substantial advertising and free publicity, is sufficient to establish a likelihood of secondary meaning)(citations omitted); *Vaughan Manufacturing Company,* 814 F.2d at 349 (plaintiff's use of its "trade dress" for over 14 years, combined with extensive advertising and evidence of copying, is sufficient to demonstrate a likelihood of secondary meaning); *Vision Ctr. Northwest,* *5-7 (16 years of continuous use and use on store signage, in advertising in print and on the radio, television, the Internet, and vision-related brochures). *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1014–15 (N.D. Ill. 2014) (denying motion to dismiss on basis that complaint's factual allegations only fall under two of the seven factors).

### 2. *Plaintiffs Have Established a Likelihood of Confusion.*

The likelihood of confusion factors also demonstrate Plaintiffs' more than negligible chance of succeeding on the merits. The Seventh Circuit employs a seven-factor balancing test on this issue: (1) the similarity of the marks; (2) the similarity of competing services; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the movant's mark; (6) evidence of actual confusion; and (7) the intent of the defendant to trade-off the movant's mark. *Meridian Mut. Ins. Co.*, 128 F.3d at 1115; *Ariel Invs., LLC v. Ariel Capital Advisors, LLC*, 238 F. Supp. 3d 1009, 1022 (N.D. Ill. 2017). No factor is dispositive and weight given to each is based on the particular facts of the controversy under consideration. *Id.* That said, the similarity of the marks, intent of the defendant and evidence of actual confusion are typically the most important. *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 898 (7th Cir. 2001); *CAE,*

*Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 677–78 (7th Cir.2001). All of these factors, save perhaps one, favor Plaintiffs here.

### a. The parties' marks are substantively identical, as are their services.

The similarity of the marks is considered "in light of what happens in the marketplace, and not merely by looking at the two marks side-by-side," *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 898 (7th Cir.2001)(citations omitted), i.e. in the context of the identical Services with which they are used: casual Cajun seafood restaurants. Flowerhorn's first three word marks are "HOT N JUICY CRAWFISH,"™ "HOT N JUICY,"™ and "HNJ,"® The only difference between these marks and Defendants' offending word marks, "HOT n JUICY CRAB," "HOT n JUICY" and "HNJC" are: the latter's use of a lower case "n" between "HOT" and "JUICY" in the first two word marks; Flowerhorn and its Affiliates' use of the "CRAWFISH" and Defendants' use of "CRAB" in their first word marks; and Defendants' addition of the letter "C" to "HNJ" with respect to the third word mark. None of these distinctions are significant. Moreover, Defendants have copied HNJ Group's "QUICKIE LUNCH DEAL"™ and "TWO HANDED PO' BOYS"™ marks verbatim, as they have its social media hashtags. As "one entering a field already occupied by another has a duty to select a trademark that will avoid confusion," *Wesley-Jessen Div. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir. 1983), the first two factors strongly weigh in Plaintiffs' favor. Indeed, the degree of overlap between the parties' marks, hashtags and menus raises a strong inference of copying.

### b. *Local* diners have repeatedly been confused between the parties.

Evidence of actual confusion "is substantial evidence of likelihood of confusion." *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 612 (7th Cir.1965). Thus, even limited instances of consumer confusion the imposition of injunctive relief. *Meridian Mut. Ins. Co.*, 128 F.3d at

10

1118–19; *Forum Corp. of N. Am.*, 903 F.2d at 443; *Ariel Invs., LLC*, 238 F. Supp. 3d at 1029. Yet here, Plaintiffs already know of at least four instances of actual confusion where Defendants' local patrons thought it was (or was affiliated with) one of Flowerhorn's restaurants, notwithstanding the fact that Defendants' first restaurant had its "soft" opening in December of this year. These instances are set forth in online Google and Yelp reviews, are explicit and themselves demonstrate the renown of Plaintiffs' Marks.

Specifically, two Google reviewers tried Defendants' restaurant because they had been to Flowerhorn's "HOT N JUICY CRAWFISH"™ restaurants in Las Vegas, Florida and/or New York and thought this was another location. (VC at ¶¶75). Another Yelp reviewer went to Defendants' restaurant because a family member had said she had been to the same restaurant in Vegas. *Id*. Another Yelp reviewer warned others not to make the same mistake (of an affiliation) that he had. *Id*. And another of Defendants' patrons mistakenly emailed Flowerhorn to complain about Defendants' services. *Id*.

### c. Defendants intend to confuse the public.

One can readily infer likelihood of confusion when there is proof of intentional copying because then "the adoption itself indicates that defendants expected that likelihood to their profit." *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 613 (7th Cir.1965)(citations omitted); *see also Henri's Food Prod. Co. v. Kraft, Inc.,* 717 F.2d 352, 359 (7th Cir. 1983). In this case, the Court can reasonably infer from Defendants' adoption of no less than *five* infringing service marks (three of which were verbatim copies), two hashtags linking them to Flowerhorn's social media posts, almost identical menus and the adoption of the same "QUICKIE LUNCH DEAL"™ (the *actual* lunch deal save for a $.99 difference in price), that Defendants' knew of Plaintiffs' Marks and intended to benefit from infringing on them. *See CFM Majestic, Inc. v. NHC, Inc.,* 93

11

F.Supp.2d 942, 956 (N.D.Ind. 2000)(inferring intent from defendant's knowledge of plaintiff's marks).

As if that evidence weren't damning enough, ***Defendants' owner was personally aware of two instances of confusion between his services and those of Flowerhorn and refused to redress it in his response to online reviews.*** (VC at ¶¶75, 79). The reasonable inference, in light of the above, was because he has been trying to create that very association from the onset. Finally, Plaintiffs put Defendants on notice of their infringement prior to bringing suit, but they did not substantively respond. (VC at ¶¶81-82). Moreover, they have not changed their menu as of the date of the brief. https://www.hotnjuicycrab.com/TinleyParkMenu. Defendants' knowing, continued use of their infringing marks after being put on notice of infringement is further evidence of intent to confuse. *TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 103 (2d Cir. 2001).

### d. Flowerhorn's marks are strong.

The alleged strength of a mark is not as important when the conflicting mark is identical and goods closely related. *Sands, Taylor & Wood Co. v. The Quaker Oat Co.,* 978 F.2d 947, 959 (7th Cir. 1992). As noted above, both are the case here. As the strength of a mark is tied to its ability to identify goods with a particular source, it is the Marks' economic and marketing strength that matters most. *AutoZone, Inc.*, 543 F.3d at 933. That strength is amply evinced by the same evidence set forth in the secondary meaning analysis above.

### e. Degree of consumer care is low in the casual restaurant context.

Where marks are identical, as here, the sophistication of consumers and their degree of care is less significant. *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 393 (7th Cir. 1985). Moreover, generally "[t]he more widely accessible and inexpensive the product and services, the more likely

that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE, Inc. v. Clean Air Eng'g., Inc.,* 267 F.3d 660, 683 (7th Cir.2001). This is also true for services that are repeatedly purchased or bought on an impulse basis. *See TV Land, L.P. v. Viacom Int'l, Inc.*, 908 F.Supp. 543, 552 (N.D. Ill. 1995). For these reasons, consumers of casual restaurant services are likely to exercise a low degree of care, which makes confusion more likely. *See* Lettuce *Entertain You Enterprises, Inc. v. Leila Sophia AR, LLC*, 703 F. Supp. 2d 777, 787–88 (N.D. Ill. 2010)

### f. The area and manner of concurrent use favor neither party.

This factor focuses on whether there is an overlap in use, promotion, distribution or sales between the services of the parties, by focusing on geographic areas of use, evidence of direct competition and a comparison of marketing channels. *Personeta, Inc. v. Persona Software, Inc.*, 418 F. Supp. 2d 1013, 1017 (N.D. Ill. 2005). Although the parties do not yet directly compete in the same geographic area, the Lanham Act aims to protect "the trademark owner's interest in capitalizing on the good will associated with its mark by moving into new markets." *Sands, Taylor & Wood,* 978 F.2d at 958 (prohibiting infringement in the context of closely related products to protect the owner's ability to enter product markets in which it might reasonably be expected to expand in the future)" That is the case here, as not only do the parties actually share customers (as demonstrated in the actual confusion evidence), Flowerhorn has received numerous franchise inquiries regarding Chicago locations and is registered to franchise here. (VC at ¶¶48-50). Permitting a junior infringer to trade on the good will of the Marks here would undermine its plans to expand the Services geographically further still.

Furthermore, businesses like hotels and restaurants can actually attract the traveling public, so even back in the 1960's the Seventh Circuit recognized such businesses may attract overlapping

clients notwithstanding large geographic separation due to the ease of travel. *See, e.g., Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 613 (7th Cir.1965) (geographic separation is not dispositive if the nature of the business, *e.g.,* hotels, is such that it attracts the traveling public). In this case, Flowerhorn's "HOT N JUICY CRAWFISH"™ restaurants have attracted patrons that fly in only to eat there. (VC at ¶70 n16). That fact, coupled with the fact that both parties utilize the same marketing channels, primarily the internet,[7] social media and print advertising (VC at ¶¶54, 59-60), means this factor is most likely neutral. In sum, then, six of the seven likelihood of confusion factors favor Plaintiffs – including the most significant ones-- with the seventh representing a draw.

### 3. Flowerhorn will be irreparably harmed if a TRO is not issued.

Consumer confusion and loss of goodwill caused by the use of similar marks supports a finding of irreparable harm. *Meridian Mut. Ins. Co.,* 128 F.3d at 1120; *see also Nat'l Fin. Partners Corp.*, 2015 WL 3633987, at *12 (any infringement that impedes a mark's identifying function causes significant harm, even if plaintiff cannot identify any lost business). Defendants are causing customer confusion, negatively impacting the good will associated with the Marks and impeding its ability to expand the geographic reach of its Marks; unquantifiable damage that will only worsen if Defendants are allowed to open their second location.

---

[7] There is also evidence of initial interest confusion on the Internet via Google searches. (VC at ¶¶76-77). Initial interest confusion arises when a seller of services is able to get its foot in the door against a direct competitor by initially confusing customers. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1341 (2d Cir. 1975) ("Misled into an initial interest, a potential Steinway buyer may satisfy himself that the less expensive Grotrian-Steinweg is at least as good, if not better, than a Steinway. Deception and confusion thus work to appropriate defendant's good will.") Such actions allow the infringer to gain crucial credibility in the initial phases of the business transaction. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987).

14

### 4. Defendants' continued use of the Marks or Colorable Imitations Thereof tips the balance of hardships and public interest considerations in favor of Plaintiffs.

Because Plaintiffs are likely to succeed on the merits and will suffer irreparable harm if a TRO is not issued, Flowerhorn is not required to demonstrate a significant balancing in its favor. *Ty, Inc.*, 237 F.3d at 895; *see Dunkin' Donuts Inc. v. Benita Corp.*, No. 97 C 2934, 1998 WL 67613, at *6 (N.D. Ill. Feb. 10, 1998)(same); *see also Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013) ("[T]he more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." (quoting *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir.1992)). Further, any alleged difficulty in rebranding that Defendants might claim is unavailing because "[o]ne entering a field already occupied by another has a duty to select a trademark that will avoid confusion." *Nat'l Fin. Partners Corp.*, 2015 WL 3633987, at *14 (citing *Ty, Inc.,* 237 F.3d at 903). Finally, the public interest in fact favors ending the confusion that consumers across the nation, including Chicagoland, are already experiencing. *See Nat'l Fin. Partners Corp.*, 2015 WL 3633987 at *15 ("[T]he Court finds that the public's interest in avoiding confusion about the companies' affiliation is relatively strong, particularly because these are logos whose sole purpose is to operate as source identifiers.").

Respectfully submitted,

FLOWERHORN, INC. d/b/a "HOT N JUICY CRAWFISH," and HNJ GROUP, INC. d/b/a "HOT N JUICY CRAWFISH,"

By: /s/ Robert H. Smeltzer
One of their attorneys

Robert H. Smeltzer
HOWARD & HOWARD, PLLC
200 S. Michigan Ave. #1100
Chicago, IL  60604
(312) 372-4000
rsmeltzer@howardandhoward.com

### Certificate of Service

    I, Robert H. Smeltzer, an attorney of record in this matter, certify that on April 12, 2019, I caused a copy of the foregoing Plaintiff's **Motion and Memorandum in Support of Emergency Restraining Order** to be filed by the Court's CM/ECF filing system, and served a copy thereof via email and hand delivery to:

Lisa A. Harkins, Esq.
Flener IP Law
77 W Washington Street
Suite 800
Chicago, Illinois 60602
Email: lharkins@fleneriplaw.com

Dated: April 12, 2019            */s/ Robert H. Smeltzer*
                                             Robert H. Smeltzer, Esq.

4827-2515-9825, v. 2